(153 App. Div. 129.)

PEOPLE ex rel. BRIDGE OPERATING CO. et al. v. PUBLIC SERVICE COMMISSION et al.

(Supreme Court, Appellate Division, First Department. November 15, 1912.)

1. STREET RAILROADS (§ 31*)—CONTRACTS FOR USE OF BRIDGE—CONSTRUCTION —ABROGATION.

A contract between the city of New York, by the commissioner of bridges, and railroad companies, for the operation of cars over a bridge under specified conditions for a specified term, entered into pursuant to Laws 1895, c. 789, § 7, as amended by Laws 1896, c. 612, providing for a commission to construct the bridge with power to contract in relation thereto, and Laws 1901, c. 466, creating a department of bridges, and conferring on the bridge commissioners specified authority, gives merely a license to operate cars over the bridge, and as such is subject to change or total abrogation in the interests of the public.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 67, 68; Dec. Dig. § 31.*]

2. CONSTITUTIONAL LAW (§ 50*)—REGULATION OF RATES.

The right to regulate fares charged by public service corporations is a legislative function.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 48, 49; Dec. Dig. § 50.*]

3. CONSTITUTIONAL LAW (§ 126*)—IMPAIRING CONTRACTS—REGULATION OF FARES—LEGISLATIVE FUNCTIONS.

Under Const. art. 8, § 1, providing that laws for the organization of corporations may be altered or repealed, and Railroad Law (Consol. Laws 1910, c. 49) § 101, declaring that the Legislature reserves the right to regulate and reduce fares on any railroad, and Public Service Commissions Law (Consol. Laws 1910, c. 48), empowering the Public Service Commission to fix maximum rates for railroads, including street railroads, the Legislature retains power over fares to be charged by public service corporations, short of actual confiscation, and such power has been conferred on the Public Service Commission, and an act by the Legislature, or an order by the Commission, reducing the fare to be charged by a railroad, is valid, though the original rate has been fixed by law before the building of the road.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325, 366–369; Dec. Dig. § 126.*]

4. CONSTITUTIONAL LAW (§ 126*)—IMPAIRING CONTRACTS—FARES—REGULATION—ORDER OF PUBLIC SERVICE COMMISSION.

An order of the Public Service Commission, created by the Public Service Commissions Law (Consol. Laws 1910, c. 48), reducing fares to be charged by street railroads operating cars over a bridge between the cities of New York and Brooklyn, pursuant to a contract between the city of New York, by its commissioner of bridges, and the railroad companies, must, when sought to be reviewed by the courts, be considered as if the Legislature had by act reduced the fares, and must determine whether the contract prohibited any reduction of the fares specified therein.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325, 366–369; Dec. Dig. § 126.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. CONSTITUTIONAL LAW (§ 126*)—IMPAIRING CONTRACTS—FARES—ORDER OF PUBLIC SERVICE COMMISSION.

A contract between the city of New York, by its commissioner of bridges, and railroad companies, for the operation of cars over a bridge between the cities of Brooklyn and New York for a specified term and for fares fixed, does not absolutely fix the fares for the period; but the Legislature or the Public Service Commission may regulate and reduce the fares during the period.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325, 366–369; Dec. Dig. § 126.*]

6. CARRIERS (§ 12*)—RATES—REASONABLENESS.

The court, in passing on the reasonableness of rates fixed by the Legislature or by the Public Service Commission to be charged by public service corporations, must consider the earning capacity of the whole route or road, and not of segregated and individual parts of the lines.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

7. CARRIERS (§ 12*)—REGULATIONS OF RATES—REASONABLENESS.

An order of the Public Service Commission, reducing fares to be charged by a public service corporation, is not unreasonable, where the reduced rates will make a larger profit on the investment than is realized by the average investor.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

Certiorari by the People, on the relation of the Bridge Operating Company and others, against the Public Service Commission and others, to review an order of the Commission. Dismissed, and order affirmed.

See, also, 135 N. Y. Supp. 1134.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, MILLER, and DOWLING, JJ.

Arthur H. Masten, of New York City, and C. L. Woody, of Brooklyn, for relators.

George S. Coleman and Henry H. Whitman, both of New York City, for respondents.

SCOTT, J. This is a proceeding by certiorari to review an order of the Public Service Commission for the First District, reducing and fixing the fares which may be charged by the relator the Bridge Operating Company for the transportation of passengers over the Williamsburg Bridge in the city of New York. The facts upon which the writ was sued out are accurately and succinctly stated by counsel for the relators as follows:

"By chapter 789 of the Laws of 1895 the mayor of the city of New York was directed to appoint a commission for the purpose of constructing a permanent suspension bridge over the East River, between the cities of New York and Brooklyn, under certain conditions, more specifically set forth in the act. By section 5 of the act the commissioners to be appointed were authorized in their discretion to purchase the charter that any corporation might have to construct a bridge such as was contemplated by the provisions of the act, together with such rights as the corporation might have to operate a railroad across such a bridge, provided that 'nothing in this act contained shall prevent said commissioners in their discretion from contracting with any corporation to operate a railroad across said bridge, if said commissioners shall determine it to be in the public interest. * * *'

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Section 7 of the act provided that upon completion the bridge should become a public highway between the cities of New York and Brooklyn, and that the management and control thereof should be vested in the trustees of the New York and Brooklyn Bridge 'who shall possess in relation thereto like powers as are vested in them in relation to the said New York and Brooklyn Bridge.'

"By chapter 612 of the Laws of 1896, section 7 of chapter 789 of the Laws of 1895 was amended, so as to provide that the care, management, and control of the bridge should be vested in the commissioners appointed to construct the bridge, 'who shall possess in relation thereto like powers as are at the time of the passage of this act vested in the trustees of the New York and Brooklyn Bridge in relation to the said New York and Brooklyn Bridge unless the Legislature shall otherwise provide therefor.' At the time of the passage of this act the powers of the trustees of the New York and Brooklyn Bridge were defined by chapter 410 of the Laws of 1882, in section 1980, as follows: 'The said trustees shall have power to fix the rates of toll for persons, vehicles and animals of every kind and description passing over the said bridge, and may operate, and authorize to be operated, a railroad or railroads over the said bridge, and fix the fare to be paid by any passenger upon any railroad operated by them.' By chapter 466 of the Laws of 1901, known as the Greater New York Charter, a department of bridges was created, the head of which was called the commissioner of bridges, and the act provided in subdivision 5 of section 595 thereof as follows: 'The board of commissioners established by chapter seven hundred and eighty-nine of the Laws of eighteen hundred and ninety-five is hereby abolished, and all its powers and duties are hereby devolved upon the commissioner of bridges of the city of New York.'

"Pursuant to the authority of the various acts above set forth, a contract was entered into, dated May 21, 1904, between the city of New York, by the commissioner of bridges, the Brooklyn Heights Railroad Company, the Coney Island & Brooklyn Railroad Company, New York City Railway Company, and Bridge Operating Company, under the terms of which the railroad companies were given the right to operate cars over the Williamsburg Bridge, under certain conditions, for a minimum period of ten years. The city agreed to complete the construction of the tracks and electrical equipment on the bridge, and the Bridge Operating Company agreed to pay to the city $10,000 a year as rental therefor (folios 632–634). The New York City Company agreed to operate for a five-cent fare through cars from the terminal at the easterly end of the bridge over the north pair of tracks in connection with its street railroad system in the borough of Manhattan, and the Brooklyn Heights Company and the Coney Island Companies agreed to operate for a five-cent fare through cars from the terminal at the westerly end of the bridge over the south pair of tracks in connection with their street railroad systems in the borough of Brooklyn (folios 642–650). The Bridge Operating Company agreed to operate local cars between the two terminals of the bridge, and the provision of the contract with respect to the fares to be charged by the Bridge Operating Company was as follows: 'The Bridge Company shall be entitled to charge a rate of fare of three cents, or less, for a single ticket or a single fare, entitling each person, actually or apparently more than three years old, to one passage across the bridge between the terminals of the surface tracks, and shall keep on sale, in such manner as shall be approved or directed by the Commissioner, tickets at the rate of two tickets for five cents, each of which tickets shall entitle any person actually or apparently over three years of age to one passage across the bridge between the terminals of the surface tracks; and the Bridge Company shall carry every person actually and apparently under three years of age free, when attended by a person over ten years of age.'"

Each of the railroad companies was to pay to the city five cents per round trip for every car operated by it over the bridge, and by article 18 of the contract it was provided that the contract should be

binding upon and inure to the benefit of the successors and assigns of the respective parties thereto. By another agreement, entered into May 21, 1904, Brooklyn Rapid Transit Company and New York City Railway Company agreed to procure forthwith the formation of a corporation under the Business Corporations Law of the State of New York, to be known as "Bridge Operating Company," the capital stock to consist of 1,000 shares of the par value of $100, of which stock each of the parties agreed to take 500 shares. Pursuant to this contract Bridge Operating Company was duly formed, and duly signed and acknowledged the agreement with the city of New York, dated May 21, 1904, to which it was a party, and on or about September 1, 1904, it purchased cars and other equipment and commenced the operation of local cars over the bridge.

By another agreement, dated May 21, 1904, between New York City Railway Company, the Brooklyn Heights Railroad Company, and Bridge Operating Company, the operation of cars authorized by the agreement with the city of New York of even date was apportioned between the parties thereto, and the rights and obligations of the parties with respect to such operation and with respect to the accounting incidental thereto were defined and determined.

Pursuant to the various agreements above mentioned, the local bridge cars were operated by Bridge Operating Company from on or about September 1, 1904, until on or about June 21, 1907, when New York City Railway Company and the Brooklyn Heights Railroad Company assumed by contract the obligations of Bridge Operating Company under its contract with the city of New York and agreed to operate Bridge Operating Company's cars and plant. Since June 21, 1907, the local bridge cars have been operated by Brooklyn Heights Railroad Company pursuant to a further agreement with New York City Railway Company.

On or about October 18, 1909, the receivers of the Metropolitan Street Railway Company, with the approval of the Public Service Commission, purchased from the receiver of New York City Railway Company the 500 shares of the stock of Bridge Operating Company owned by New York City Railway Company, together with the rights of New York City Railway Company under the contract above mentioned entered into May 21, 1904, with the city of New York. The railroads and property of Metropolitan Street Railway Company, covered by two mortgages, were purchased by the New York Railways Company, and have been, since January 1, 1912, and now are, operated by New York Railways Company, which company expects to purchase from the receivers of Metropolitan Street Railway Company the stock of Bridge Operating Company and the rights originally acquired by New York City Railway Company in connection therewith, and is now negotiating for the purchase of the same.

The main contention on the part of the relators is that the agreement between the commissioner of bridges, the Bridge Operating Company, and the railroad companies which executed the agreement constituted a valid contract for the term of ten years mentioned therein, and that within that term neither the Legislature nor the city of

New York could lawfully impair or abrogate it. We are not concerned at the present time with a consideration as to the power of the city of New York to alter the terms of the agreement, for the city is not undertaking so to alter it. The only question before us is as to the power of the Legislature.

[1] The nature of the agreement in question has already been judicially determined. It was held in Schinzel v. Best, 45 Misc. Rep. 455, 92 N. Y. Supp. 754, affirmed on opinion below 109 App. Div. 917, 96 N. Y. Supp. 1145, that it conferred no franchise upon the Bridge Operating Company, but merely a license to operate cars over the bridge, and as such was subject to change in its terms, or even total abrogation, if the public interests should so require—citing N. Y. Mail & N. T. Co. v. Shea, 30 App. Div. 266, 51 N. Y. Supp. 563.

[2] The right to regulate the fares to be charged by public service corporations is essentially a legislative function and it may well be doubted whether, in this state, the Legislature may lawfully deprive itself of, or delegate to any other body or officer, municipal or otherwise, the power to bind it for a definite term not to exercise the inherent power to regulate such rates.

[3] The Constitution of the state (article 8, § 1) provides as follows:

"Section 1. Corporations, Formation of.—Corporations may be formed under general laws, but shall not be created under special act, except for municipal purposes, and in cases where in the judgment of the Legislature, the object of the corporation cannot be obtained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

The Railroad Law as it existed at and long prior to the time when the agreement of May 21, 1904, was entered into contained this provision:

"Section 101. Rate of Fare.—No corporation constructing and operating a railroad under the provisions of this article, or of chapter two hundred and fifty-two of the Laws of eighteen hundred and eighty-four, shall charge any passenger more than five cents for one continuous ride from any point on its road, or on any road line or branch operated by it, or under its control, to any other point thereof, or any connecting branch thereof, within the limits of any incorporated city or village. * * * The Legislature expressly reserves the right to regulate and reduce the rate of fare on any railroad constructed and operated wholly or in part under such chapter or under the provisions of this article." Laws 1890, c. 565.

This section was re-enacted without change in the present Railroad Law, which went into effect June 14, 1910 (Consol. Laws 1910, c. 49), as section 181, except that there was added the following:

"And the Public Service Commission shall possess the same power, to be exercised as prescribed in the Public Service Commissions Law."

The Public Service Commissions Law (Consol. Laws 1910, c. 48) provides:

"Section 26. Safe and Adequate Service; Just and Reasonable Charges.— Every corporation, person or common carrier performing a service designated in the preceding section [transportation of passengers or property from one point to another within the state of New York] shall furnish, with re-

spect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable. All charges made or demanded by any such corporation, person or common carrier for the transportation of passengers or property or for any service rendered or to be rendered in connection therewith, as defined in section two of this chapter, shall be just and reasonable and not more than allowed by law or by order of the Commission having jurisdiction and made as authorized by this chapter. Every unjust and unreasonable charge made or demanded for any such service or transportation of passengers or property in connection therewith or in excess of that allowed by law or by order of the Commission is prohibited."

Section 2, referred to in the section just quoted, provides (subdivision 5):

"The term 'street railroad,' when used in this chapter, includes every railroad by whatsoever power operated, * * * for public use in the conveyance of persons or property for compensation, being mainly upon, along, above or below any street, avenue, road, highway, *bridge* or public place in any city," etc.

The Public Service Commissions Law further provides (section 49, subd. 1):

"Whenever either Commission shall be of opinion, ·* * * that the rates, fares or charges demanded, exacted, charged or collected, * * * by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of persons or property within the state * * * are unjust * * * the Commission shall * * * determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, *notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute*," etc.

It seems to be quite clear that the Legislature retains such complete power over the fares to be charged by public service corporations (short of actual confiscation) that an act reducing the fares to be charged by a railroad corporation is valid, even although the original rate has been fixed by law before the road was built. People ex rel. Del. & Hudson Co. v. Public Service Commission, 140 App. Div. 839, 125 N. Y. Supp. 1000. There seems to be no doubt that the Legislature, by the statutes above quoted, has conferred upon the Public Service Commission authority to exercise the power to fix and regulate fares.

[4] The order now sought to be reviewed must therefore be considered as if the Legislature itself had, by act, reduced the fares to be charged by the Bridge Operating Company, and the question to be determined is whether or not the license agreement of May 21, 1904, operated to unalterably regulate and fix the fares in question during the term of the license. That question seems to be answered by the case of Richmond County Gas Co. v. Town of Middleton, 59 N. Y. 228. In that case the Legislature had expressly authorized the town to contract for a supply of gas, and the town had made such a contract for a fixed term of years. Subsequently, and before the expiration of the term of the contract, the Legislature repealed the act authorizing it. It was insisted by the gas company that its contract was protected by the constitutional prohibition against impairing the obligations of a contract. The court, however, pointed out that the town

could exercise no power in the premises, except such as was conferred by the Legislature, and could, by no act of its own, extend or expand the legislative authority. The act conferring power upon the town to contract contained no specification of the time for which such a contract might be made, so that, in undertaking to contract for a definite term of years, the town exceeded its grant of power from the Legislature. This, it was held, could not be done; the court saying:

"The power so conferred was, like the other powers conferred upon officers of this and other towns of the state, subject to modification or repeal by subsequent legislation, and the town auditors could not, by any contract, prevent or at all control the action of the Legislature in this respect."

[5] Referring back to the statutory authority under which the agreement of May 21, 1904, was entered into by the bridge commissioner in behalf of the city of New York, it will be seen that no authority is given to him to fix any specific time during which the fares authorized by him shall prevail. His authority, like that conferred upon the officers of the town of Middleton, was merely to fix the fares to be charged upon a railroad operating over the bridge (Laws 1882, c. 410, § 1980); but he was not given power to make a permanent rate, or one which should obtain for any definite period. In so far as he undertook to do this, he acted without legislative authority, and his act cannot bind or control the power of the Legislature. The Bridge Operating Company, and those interested with it, were bound to take notice of the limitations imposed by statute upon the commissioner with whom they contracted. Our conclusion, therefore, is that it is within the power of the Legislature, and consequently within the power of the Public Service Commission, to regulate and reduce the fares to be charged by the Bridge Operating Company, notwithstanding the ten-year license issued by the bridge commissioner.

The relators rely with much insistence upon certain cases in the Supreme Court of the United States, notably upon Detroit v. Detroit Citizens' Street Railway Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, and City of Minneapolis v. Minneapolis St. Ry. Co., 215 U. S. 417, 30 Sup. Ct. 118, 54 L. Ed. 259. In neither of these cases do the facts coincide with those in the principal case, nor is the same legal question involved. In the Detroit Case the Legislature had authorized the city to enter into an agreement with the street railway company fixing the fares to be charged. Such an agreement was made for a term of 30 years. Within that time the city, not the Legislature, undertook by ordinance to reduce the fares. It was held that, as between the city and the railway company, the agreement constituted a valid contract, which was protected by the Constitution, and Mr. Justice Peckham, who wrote for the court, was careful to say:

"The Legislature has not attempted to interfere with the rights of the street railway companies in Detroit, and hence the extent of its power to do so is not involved in this case." 184 U. S. 397, 22 Sup. Ct. 421, 46 L. Ed. 592.

A similar state of facts was presented in the Minneapolis Case. It was the city, not the Legislature, which undertook to alter the terms

of the contract into which it had entered under legislative authority, and no question was involved or discussed as to the power of the Legislature.

In Calder v. Michigan, 218 U. S. 591, 31 Sup. Ct. 122, 54 L. Ed. 1163, the court, by Mr. Justice Holmes, made a remark which is pertinent to the present discussion. The Legislature, under its reserved power, had repealed the charter of a water company, which had already laid pipes and established a plant. The court said:

"If the city gave the privilege of using the streets to a corporation forever, it could not enlarge the right of the corporation to continue in existence as against the sovereign power."

If the attempt to reduce the fares to be charged by the Bridge Operating Company was the act of the city, without legislative support or authority, we should have to deal with a very different question, and one to which the federal cases above cited would very likely be applicable. But we have no such question, nor need we consider now whether or not the reduction of the fares, by the paramount power of the Legislature, would work such a change in the terms of the license as would justify the Bridge Operating Company in surrendering it.

[6] The street railroad companies which own (or expect to acquire) the stock of the Bridge Operating Company own and operate the lines in the city of New York, on both sides of the river, running what are termed "through cars" over the bridge. They sought to show that the operation of these through cars over the bridge, not over the whole route, including the bridge, was conducted at a loss, and claim that they should be allowed to recoup themselves by sharing, as stockholders, in the extravagant profits of the bridge cars. This offer of proof was, as we think, rightly rejected. The rule generally adopted both by the federal and the state courts is that, in passing upon the reasonableness of rates, consideration must be had of the earning capacity of the whole route or road, and not of segregated and individual portions of the lines. Portland Railway, etc., Co. v. Railroad Commissioners of Oregon, 56 Or. 468, 105 Pac. 709, 109 Pac. 273; State v. Northern Pacific Ry. Co., 19 N. D. 45, 120 N. W. 869, 25 L. R. A. (N. S.) 1001; Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151.

[7] It is further objected that the reduction of fares ordered by the Public Service Commission is unreasonable. Upon this subject we have no hesitation in affirming the action of the Commission. The Bridge Operating Company upon its own showing has been making, at the old rates, an unreasonably large profit, and at the reduced rates will undoubtedly make a much larger profit on its investment than is realized by the average investor.

Our conclusion is that the writ must be dismissed, and the order of the Public Service Commission affirmed, with $10 costs and disbursements to the respondents. All concur.