Matter of the Application of FRED C. KOEHN, Individually and as Mayor of the City of Tonawanda, and the CITY OF TONAWANDA, Relators, for a Writ of Prohibition against the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, for the Second District, and the INTERNATIONAL RAILWAY COMPANY, Defendants.

Matter of the Application of CARL F. DREWES, Individually and as Mayor of the City of North Tonawanda, and the CITY OF NORTH TONAWANDA, Relators, for a Writ of Prohibition against the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, for the Second District, and the INTERNATIONAL RAILWAY COMPANY, Defendants.

Matter of the Application of the VILLAGE OF LA SALLE, and JOHN J. RUSS, Individually, Relators, for a Writ of Prohibition against the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, for the Second District, and the INTERNATIONAL RAILWAY COMPANY, Defendants.

(Supreme Court, Albany Special Term, May, 1919.)

Constitutional law — railroad built upon private property and engaged in interurban traffic is not a " street railroad " — municipal corporations — statutes — consents — when fixing of rates is beyond municipal control — State Const. art. III, § 18.

Public service commission — has authority to investigate the justness and reasonableness of rates of fare to be charged — municipal corporations — Railroad Law, § 171.

> While in the absence of a statute parties may contract with reference to a matter which the state has the power to regulate and control, yet when the state does act, the statute absolutely controls.

> A railroad built wholly upon private property and across streets and engaged in interurban traffic is not a " street rail-

road" within the constitutional provision (State Const. **art.** III, § 18) which declares that "no law shall authorize the construction or operation of a street railroad except upon the condition that the consent ° * * of the local authorities having the control, etc."

Said constitutional provision was intended to confer upon localities power to impose conditions, if at all, pertinent to the grant of such consents, so far as the municipalities have a city purpose to protect not inconsistent with the public interests of the state at large.

The fixing of interurban rates of railway fare is normally a legislative function to be exercised in the interest of the general public, and in the absence of clear warrant of authority so to do, the fixing of such rates is beyond municipal control.

The public service commission, second district, has authority to investigate the justness and reasonableness of rates of fare to be charged by the International Railway Company which includes urban lines in the cities of Buffalo, Lockport and Niagara Falls and certain interurban lines connecting the same, and to order and permit said company to charge rates in excess of those specified in the consents of the cities of Tonawanda, North Tonawanda and the village of La Salle given in 1914 pursuant to section 171 of the Railroad Law, for transportation outside the limits of said cities or village respectively, and from points outside of said limits.

MOTIONS for alternative writs of prohibition.

Roland Baxter, for City of Tonawanda.

James P. Lindsay, for City of North Tonawanda.

George M. Tuttle, for Village of La Salle.

Ledyard P. Hale, for Public Service Commission.

Cohn, Chormann & Franchot (Morris Cohn, Jr., and Edward E. Franchot, of counsel), for International Railway Company.

HINMAN, J. These proceedings arise upon an order to show cause why alternative writs of prohibition

should not issue prohibiting the public service commission, for the second district, from continuing an investigation upon which it has entered, as to the reasonableness of the interurban fares set forth in a new tariff filed by the International Railway Company.

This company includes urban lines in the cities of Buffalo, Lockport and Niagara Falls and certain interurban lines connecting same. It operates two lines between Buffalo and Niagara Falls, one, referred to as the " high speed line," having been opened for operation in June, 1918, the other, generally known as the " old line," having been opened for operation September 21, 1895. The high speed line is built wholly upon private right of way between Main street, Buffalo, and Portage Road, Niagara Falls, all streets in the city of Tonawanda being crossed overhead, and the principal streets in North Tonawanda being crossed overhead, the sole place where the high speed line runs along the highway being about 1,200 feet on Erie street, in the village of La Salle. Consents for the construction of this high speed line, which was built as an extension of the street railway system of the International Railway Company, were obtained not only from the local authorities under section 171 of the Railroad Law, but also under section 21 of the Railroad Law. The company procured orders of the Supreme Court for the construction of such line upon its private right of way. Another line of the company is through the cities of Tonawanda and North Tonawanda to the city of Lockport. Between Buffalo and North Tonawanda, the tracks are laid upon the right of way of the Erie Railroad Company, under an agreement with that company. Between North Tonawanda and Lockport, the International Railway Company operates by electricity the railroad formerly operated by steam of the Erie Railroad Company.

The claim of each of the cities of Tonawanda and North Tonawanda is that by the consents granted in about the year 1914 for the construction of said high speed line, by said cities, respectively, which consents were duly accepted by the said company, rates of interurban fare between said cities, respectively, and other points upon said lines were fixed at an agreed maximum, and that the public service commission is without jurisdiction to establish the higher rate proposed in the new tariff filed or any higher rates, however reasonable and just, and even though the maximum rates fixed by the local agreement are confiscatory, as indicated by the facts thus far produced in evidence before the commission at a recent hearing. No claim seems to be made by the cities of Tonawanda and North Tonawanda that the consents granted for the operation of the old lines made any specification as to fares to be charged and they are evidently relying upon the provisions inserted in the consents granted in 1914 for the construction and operation of the high speed line.

In the case of the village of La Salle, the same proposition is presented, based upon the consent for the high speed line, and also the claim that on account of an extension of time to construct, granted by the highway commissioner of the town of Niagara (predecessor of the village of La Salle) in respect to the old line, on the 26th day of November, 1895, certain interurban fares were fixed, and that the grant of power delegated to the public service commission by the legislature is not sufficiently broad to allow the commission to increase such interurban fares. It appears, however, in this respect, that the extension of time within which to complete, granted November 26, 1895, by the commissioner of the town of Niagara, was executed and accepted upwards of two months

after the old line was in full operation between Buffalo and Niagara Falls.

Thus the status of these local agreements is determinable almost entirely, if not entirely, as of 1914, when the consents for the high speed line were obtained, four years after the Public Service Commissions Law of 1910 and the Railroad Law of that year were passed.

The purely interurban character of the high speed line is clearly indicated by the terms of the consents themselves. The La Salle consent provided that the high speed line cars should stop at one place, at least, within the corporate limits of the village and have a station. The Tonawanda consent provided for one stop at least, and not more than two, within its corporate limits. The North Tonawanda consents provided for five stops and for stations at these stopping places. Each of the above consents also provided for fencing the right of way. All of these provisions reveal that there was no contemplation that this line should operate along the streets and avenues of these cities or of this village to accommodate the street travel of those living or moving thereon, which is and always has been contemplated as the distinguishing feature of a street railway. The high speed line was constructed upon its own private right of way and when it crossed a street the necessity therefor was only incidental to the main purpose of running an interurban railway line. It was in no sense an urban line.

It is further claimed that efforts made by the company to establish just and reasonable rates for through traffic between Buffalo and Niagara Falls and Buffalo and Lockport, and *vice versa,* have been frustrated because passengers have succeeded in combining the intermediate rates by transferring from car to car, or waiting over one car at Tonawanda, North Tona-

wanda or La Salle. Moreover, complaint has been made by passengers to the public service commission that the effort of the company to establish a through fare between Buffalo and Lockport greater in amount than the sum of the intermediate fares between Buffalo and North Tonawanda and North Tonawanda and Lockport, is unjust and discriminatory; and it is claimed that the sitting commissioner indicated that he shared that view. Thus the provisions for maximum fares contained in the consents seem to result in the company's inability to charge what may be reasonable and just fares between Niagara Falls and Buffalo and Lockport and Buffalo, and *vice versa.*

The railway company contends that the public service commission has authority to investigate the justness and reasonableness of the rates to be charged by the company and to order or permit such company to charge rates in excess of those specified in the consents of the local authorities for transportation outside the limits of the village or city respectively and from points situated outside of said limits. The company relies in great measure upon the recent decision in *People ex rel. Village of South Glens Falls* v. *Public Service Commission,* 225 N. Y. 216. The cities and village, respectively, rely upon the decision in *Matter of Quinby* v. *Public Service Commission,* 223 N. Y. 244.

As was said by Mr. Justice Bradley in *Oregon Steam Navigation Co. v. Winsor,* 20 Wall. 64: " Cases must be judged according to their circumstances, and can only be rightly judged when the reason and grounds of the rule are carefully considered." This becomes the more necessary here in view of the fact that in none of the opinions of the Court of Appeals in the *Glens Falls* case was there any suggestion that any greater jurisdiction in the public service commission was indicated by the language used in subdivision 5

of section 66, in respect of gas companies, than by
section 49, in respect of railroads. In fact similar
language is interpreted in the one case to hold that it
was not the intention of the legislature to confer power
upon the commission to raise a rate beyond the amount
agreed upon between a locality and a railway com-
pany, and in the other case to hold that it was the
intention to confer that power as to gas companies
which had entered into local agreement as to gas
rates. In view of the fact that the applicants in these
proceedings before me dwell with emphasis upon the
language used by Judge Pound in the *Quinby* case to
the effect that the railway provisions of the law dealt
" with maximum rates of fare established by statute
but make no reference in terms to rates established by
agreement with local authorities," it is important to
note that, in the *Glens Falls* case, similar language in
the law relating to gas companies is interpreted to con-
fer power to deal with rates established by agreement
with local authorities. Consequently, if there were no
other basis for the decision of the Court of Appeals
in the *Quinby* case, it would follow that the *Glens Falls*
case constituted a reversal of the law of the *Quinby*
case. If, however, we consult the opinion of Judge
McLaughlin in the *Glens Falls* case, in which he sets
forth in detail all of the elements considered in the
*Quinby* case and distinguishes it, we see that the
language was clear and definite enough in an ordinary
case but that in the extraordinary circumstances
involved in the *Quinby* case something more definite
and clear was needed. In the latter case, the railroad
company had to obtain the consent of the municipal
authorities (Const. art. III, § 18) ; a maximum rate of
fare within the city of Rochester was imposed by the
consent; this agreement was confirmed by a later con-
tract; the contract was expressly recognized by the

legislature in section 173 of the Railroad Law (Laws of 1910, chap. 481); in section 181 of the same law a provision was inserted which prohibits a railroad operating in any incorporated city or village from charging more than a five cent fare for a continuous ride within such city or village; and in 1915 the legislature amended the charter of the city of Rochester and added a new section which provides that all street surface railroads operating therein should not charge more than five cents.

All of these things influenced the judgment of the court in the *Quinby* case, as interpreted in the *Glens Falls* case, in reaching the conclusion that the general language of the Public Service Commissions Law, section 49, was not adequate to overcome the fair inference, at least, conveyed from the special provisions of law in the charter and other acts, that such power had not been included in the jurisdiction of the commission.

It is a familiar rule " that a special statute providing for a particular case, as applicable to a particular locality, is not repealed by a statute, general in its terms and application, unless the intention of the legislature to repeal or alter the special law is manifest, although the terms of the general act would, if strictly construed, but for the special law, include the case or cases provided for by it." *Casterton* v. *Town of Vienna,* 163 N. Y. 368, 371, and cases cited.

Thus the court has not said in unequivocal terms that the language of section 49 cannot be interpreted in a proper case to confer jurisdiction in the public service commission to deal with rates of fare established by agreement with local authorities. The decision in the *Glens Falls* case indicates, rather, that the rule in the *Quinby* case is not to be extended, but is

to be applied only to those cases which rest upon similar facts in all respects.

The facts in the *Quinby* case were: (a) that the provisions of section 18 of article III of the Constitution interfered with the passage of legislation authorizing the construction or operation of a street railway except upon the condition that the consent of the local authorities be first obtained; (b) that the contract had been recognized by the legislature by section 173 of the Railroad Law of 1910; (c) that section 181 of the same law had prohibited more than a five cent fare within any incorporated city or village; (d) that by special statutory enactment in 1915, subsequent to the enactment of the Railroad and Public Service Commissions Law of 1910, there was an express legislative fixing of fare for the city of Rochester.

There is no similarity between the facts in the *Quinby* case and the instant case. It seems to be conceded that neither the charters of the cities of Tonawanda and North Tonawanda, nor the law under which the village of La Salle was incorporated, nor any other law of the state has conferred upon said political subdivisions of the state the power to fix rates of fare to be charged for the transportation of passengers within their respective territorial limits; that no such law has ever conferred upon said political subdivisions power to regulate the fixing of fares for the transportation of passengers to and from places outside of the territorial limits of said political subdivisions; that there has been no legislative recognition whatever of any of the provisions of any of the consents in question, or of the rates of fare involved in said consents; that there is no statute fixing interurban rates of fare similar to section 181 of the Railroad Law of 1910, which fixes urban rates in any incorporated city or village, or similar to the charter provision of 1915

of the city of Rochester, which fixes an urban rate in the city of Rochester.

Thus far, in the instant case, there is a clear distinction from the facts appearing in the *Quinby* case and it remains to consider only the effect of the constitutional provision.

We have seen that the high speed line consents were obtained in 1914, and that it is the effect of local agreements then obtained which is mainly in question, the earlier La Salle agreement as to the old line in that place being of doubtful validity due to an apparent waiver of the time limit within which the railroad was to complete construction. The second consent, upon which the village now relies, was executed and accepted over two months after the old line was in full operation. We have also seen that the rates of fare involved here upon both the high speed line and the old line are interurban rates alone and that the high speed line has been constructed upon a private right of way and is not in any sense an urban railroad but an interurban line. The constitutional provision relates to the construction and operation of a " street railroad." It is my opinion that a railroad built wholly upon private property and across streets and engaged in interurban traffic, as this high speed line was, was not within the contemplation of the term " street railroad " as used in the constitutional provision (Art. III, § 18) which was inserted in the Constitution in 1874. It was said, in *Matter of South Beach R. R. Co.*, 119 N. Y. 146, in reference to street railroads: " Now the chief element of a street railway, as authorized by the act of 1884, is that it is built upon and passes along streets and avenues for the convenience of those living or moving thereon. Its fundamental purpose is to accommodate the street travel, and its motive power is dictated and regulated

to that end; and while, consistently with its general object, it may need for switches or storage, or stables or stations the land of private owners, yet that necessity is only incidental to the main purpose of a line along the streets accommodating the street travel.'' Thus as late as 1890, the Court of Appeals has indicated the essential feature of a street railway to be an urban railway,— a railway which operates along the streets and avenues of a city or a village to accommodate the street travel of those living or moving thereon.

So also, in recent cases under the Federal Safety Appliance Act, which exempted from its operation cars used upon street railroads, it has been assumed that operation of cars ordinarily known as street cars over railroads built upon private right of way is not the use of cars upon a street railroad. *Spokane & I. E. R. Co.* v. *United States*, 241 U. S. 344; *United States* v. *International R. Co.*, 238 Fed. Repr. 317.

Moreover, as I have before stated, Supreme Court orders were obtained, under section 21 of the Railroad Law, in respect to the construction of this high speed line as well as consents from the local authorities, under section 171 of the Railroad Law.

Assuming, therefore, that these municipalities had the power to fix rates of urban fare as a condition of the granting of consents to an urban railroad, did they have any authority, implied in this constitutional provision, to fix rates of interurban fare as a condition of the granting of consents to such an interurban line as is here in question? Does it serve a public purpose of the city to fix rates of fare to and from other municipalities? It is my opinion that the consideration asked by the city cannot be something which is not germane to the public purpose for which the city and its govern-

ment exists and certainly not something which is contrary to the public policy of the state.

The constitutional provision was intended to confer upon the localities power to impose conditions, if at all, pertinent to the grant of such consents so far as the municipality had a city purpose to protect not inconsistent with the public interests of the State at large. The fixing of interurban rates of fare is normally a legislative function to be exercised in the interest of the general public, beyond the control of any city in the absence of clear warrant of authority therefor. It certainly was not intended to permit a city to invade the sovereignty of the state, where, as in the fixing of interurban rates, the rights of other municipalities and the inhabitants of the state generally are involved and where thus a state issue rather than a local concern is clearly indicated. This compels the interpretation that the constitutional provision was not intended to cover such a contingency as arises in this case and that the legislature has never meant to leave any such unusual power in any municipality under the sanction of the constitutional provision but has reserved full authority in itself for that purpose and has given such power to its own agent, the public service commission.

It is a general principle that when the state or nation has power to regulate and control a matter of law, until it acts parties are at liberty to contract with reference thereto, but when it does act the statute absolutely controls. When the Public Service Commissions Law was passed in 1910, the state did assume to control rates and even if the Court of Appeals has said in the *Quinby* case that the commission has not been given power to control rates within the city of Rochester by reason of the constitutional consents and special statutes, surely it cannot be said that such

decision necessarily applies to all cases and particularly where the agreement invades the normal jurisdiction of the state sovereignty, involving matters not pertinent alone to the city and its inhabitants, but reaching out beyond its territorial limits.

In *Milwaukee Elec. R. & L. Co.* v. *Railroad Commission of Wisconsin,* 238 U. S. 174, the court said: " The fixing of rates which may be charged by public service corporations, * * * is a legislative function of the State," and that the grant or surrender of the power to the municipality cannot lightly be assumed or presumed. If such grant or surrender is made, it must be made in plain and unequivocal terms. Specific authority for the purpose is required. Thus, it cannot be lightly assumed that the constitutional provision was intended to confer authority upon the cities of the state to fix interurban rates. That right should be conferred with the same clear and definite language which the Court of Appeals said in the *Quinby* case was necessary to confer power on the commission to deal with purely urban rates in the city of Rochester.

It has also been said in the case of *Milwaukee, etc., R. Co., supra:* " No specific authority having been conferred on the city to enter into the contract in question, the right of the State to interfere whenever the public weal demanded was not abrogated. The contract remained valid between the parties to it until such time as the State saw fit to exercise its paramount authority, and no longer."

The Supreme Court of the United States has recently said that one whose rights are subject to state restriction cannot remove them from the power of the state by making a contract about them. *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372.

In *People ex rel. South Shore Traction Co.* v. *Will-*

*cox,* 196 N. Y. 212, it was said: " So far as the consent of the municipal authorities  *  *  *  may be limited by conditions which are in conflict with the provisions of the Public Service Commissions Law, it is enough to say that the statute must prevail."

It has been said, also: " Contracts must' be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority." *Louisville & N. R. Co.* v. *Mottley,* 219 U. S. 467, 482; *Knox* v. *Lee,* 12 Wall. 457, 550.

In the *Glens Falls* case Judge McLaughlin said, with reference to the local agreement with the gas company, that both parties " were bound to take notice of the right of the state to step in at any time and fix a rate other than that stated in the franchise." Further, speaking of the right of the municipality to regulate rates of public service corporations, Judge McLaughlin said: " Every doubt must be resolved in favor of the continuance of the power in the state."

If the Public Service Commissions Law and the Railroad Law of 1910 did not purport to interfere with existing contracts, as in the *Quinby* case, but looked to the future, it may be said that thereafter the agreements with local authorities made pursuant to those statutes, passed upon the report of a revision commission as authorized by article III, section 23 of the Constitution, were made and must be presumed to have been made with knowledge of and subject to all the provisions of those acts and that action was taken with reference thereto.

Moreover, a municipality, any more than an individual, cannot defeat the legitimate authority of the state by making a contract, and if it has overstepped the purview of the constitutional provision in assum-

ing to fix interurban rates, it may bind the railroad
by estoppel after the railroad has obtained the bene-
fits of the consent, but it cannot assume to bind the
state by a twenty year provision in the consent pro-
viding for modification of the fares by competent pub-
lic authority only after the expiration of that period,
which has been done in some of these 1914 consents.

Even if the railway company is estopped for any
reason to question the validity and effectiveness of the
contract, is the state or public service commission pre-
vented from exercising authority, '' upon its own
motion '' as permitted in section 49 of the Public Serv-
ice Commissions Law, where the right of creditors and
stock and bond holders of the railway company and
the public generally who are interested in avoiding the
destruction of a valuable public utility, are involved?
Did the *Quinby* case cover such agreements, which
may be void as against public policy and as invading
the normal jurisdiction of the state and general juris-
diction of the public service commission and in no way
within the reasonable intendment of the constitutional
provision?

Can the city of Tonawanda to-day fix a rate of fare
by a condition in a consent which has effect outside
its own boundaries and thus deprive the public service
commission of jurisdiction clearly given to it? That
would be putting the railroad system of the state at
the mercy of some of its cities in a matter concerning
not only the inhabitants of those cities but all the
inhabitants of the state. If the New York Central
Railroad were to be built to-day as an interurban
railroad passing as it does for miles along a street of
Syracuse, that city could control the rates of fare from
New York to Buffalo. And illustrations could be
multiplied.

If the city of Tonawanda could insert such a fare

Supreme Court, May, 1919. [Vol. 107.

condition, as it has, effective outside the city, why could not that city prescribe a condition that no stops should be made outside that city except at Buffalo and Niagara Falls, notwithstanding many other communities lying between demanded service? It is, perhaps, easier to see how a public interest would attach to such a case than to a raise in fares, although the principle is the same. Judge Crane said in the *Glens Falls* case: " Reduction in rates seems to be generally recognized as a public benefit, and yet an increase may be equally so."

Surely the Court of Appeals in the *Quinby* case referred to agreements coming within the purview of the constitutional provision and not to agreements which could not be sustained as coming within its fair and reasonable intendment and as to which, on grounds of general public policy of the state, the police power of the state must have been reserved in the absence of clear constitutional or statutory provision to the contrary. Just as it was intended by the constitutional provision to protect the city in matters of local concern, so, in the absence of clear warrant to the contrary, the Constitution should be interpreted to protect the state and its inhabitants in all matters of state concern.

I am, therefore, convinced that the constitutional provision in question was not intended to protect these cities and this village in the making of such agreements as to these interurban fares, that the agreements in question are not dignified by any constitutional local power, as in the *Quinby* case, and, that, as in the *Glens Falls* gas case, the public service commission has been given jurisdiction to investigate and fix reasonable rates.

Therefore, I hold that the principle of the decision in the *Glens Falls* case, rather than that of the *Quinby*

case, is applicable here and it follows that the motions for alternative writs of prohibition should be denied in each instance.

, Motions denied.