THE PEOPLE OF THE STATE OF NEW YORK ex rel. NEW YORK, WESTCHESTER AND BOSTON RAILWAY COMPANY, Relator, v. THE PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK IN AND FOR THE FIRST DISTRICT and Others, Respondents.

First Department, July 2, 1920.

Railroads — power of Legislature to authorize railroad to cross street or highway without consent of local authorities — municipal corporations — power of city of New York to fix fares as condition of consent to railroad to cross streets — limit of authority in giving such consent — right of railroad where improper conditions imposed — estoppel — when railroad operating within city not street railroad — giving consent to cross streets as exercise of police power — accepted ordinance giving consent and fixing fares as contract within Federal Constitution — power of Legislature to regulate fares — Public Service Commission, jurisdiction to regulate fares.

The public roads and highways throughout the State are held for the use and benefit of the public, and there being no constitutional limitation on the power of the Legislature to authorize the incorporation, construction and operation of railroads, other than street railroads, except that they must be authorized by general laws, it is competent for the Legislature to authorize a railroad, other than a street railroad, to be constructed upon, along or across any public highway or street in the State without obtaining the consent of the local authorities therefor.

The city of New York had no authority, in passing on an application by the relator, a railroad corporation organized under the General Railroad Law, for consent to cross the streets of the city above or below grade, as a condition of granting its consent, to revise or change the fares prescribed by the Legislature.

The authority possessed by a city in giving its consent to a railroad organized under the General Railroad Law to cross the streets of the city above or below grade is limited to regulating the crossing with respect to the convenience and safety of those lawfully using the streets.

*It seems*, that where a city in granting consent to a railroad to cross the streets imposes the condition that a different rate of fare be charged within the city from that fixed by the Legislature, it may be compelled to eliminate from its consent the attempt to regulate fares. But, it seems also, that where the railroad formally accepts the conditions imposed as to fares, and acquiesces therein, it should not be heard, in its own right, to question the validity of the provisions of the ordinance as binding on it until it is relieved therefrom.

A railroad is not a street railroad where it was organized under the General Railroad Law, and where it uses no part of the surface of any street or

highway but operates on its own private right of way, and does not take on or discharge passengers on streets or at street crossings, but only at its own stations on its private right of way.

The city of New York in enacting ordinances giving its consent to the relator to cross its streets above or below grade, was not exercising any power or authority derived from the Constitution or with respect to matters concerning which it had any absolute right, but was exercising part of the police power of the State, delegated by the Legislature, over which the Legislature has full control.

And, therefore, though the grant or consent made to the relator when formally accepted by it became in a sense a contract, the police power with respect to regulating fares did not irrevocably pass, and the contract thus evidenced did not become a contract within the protection of subdivision 1 of section 10 of article 1 of the Federal Constitution, but remained subject to the police power of the State under which the exercise of the grant might be regulated from time to time as required in the interests of the public.

*It seems*, that if the Legislature had delegated irrevocably to the city of New York all of its powers with reference to rates to be charged by the relator within the city limits, and if sections 72-74 of the Greater New York charter were applicable to a consent to the crossing of streets by such railroad corporation, the authority conferred has not been exercised as authorized, since the rates permitted to be charged were not such as to secure efficiency of the public service and the maintenance of the property in good condition, and, therefore, it remained competent for the Legislature to take such action as might be necessary with respect to the rate of fare to be charged to secure the efficiency of the public service contemplated by the grant.

The Legislature has delegated to the Public Service Commission, by virtue of the provisions of sections 29 and 49 of the Public Service Commissions Law, its jurisdiction and authority to increase the fare to be charged by the relator within the limits of the city of New York, and the Commission has jurisdiction to authorize the relator to charge a higher rate of fare than that prescribed by the ordinance accepted, provided the rate so prescribed is found by the Commission to be insufficient to give reasonable compensation for the service rendered; the Commission may fix a just and reasonable rate.

CERTIORARI issued out of the Supreme Court and attested on the 5th day of February, 1920, directed to the Public Service Commission of the State of New York in and for the First District and others, commanding them to certify and return to the office of the clerk of the county of New York all and singular their proceedings had in annulling a tariff schedule of rates of fare for the transportation of passengers in so far as it showed an increase from five to seven cents for such transportation between stations in the city of New York.

The changed passenger tariff schedule was filed with the Commission by the relator on the 20th of October, 1919, pursuant to the provisions of section 28 of the Public Service Commissions Law (Consol. Laws, chap. 48; Laws of 1910, chap. 480). The schedule affected the rates of fare between the southwesterly terminus of the relator's line at the Harlem river and New Rochelle and White Plains in Westchester county beyond the boundary of the city of New York; and purported to cancel the then existing passenger tariff of the relator. The Commission suspended the operation of the schedule and ordered a public hearing thereon pursuant to the provisions of section 29 of the Public Service Commissions Law (as amd. by Laws of 1914, chap. 240). The city of New York, on its application, was permitted to intervene and take part in the hearing. Evidence was taken and counsel for the respective parties were heard. The city contended that the rate of fare within the limits of the city of New York was irrevocably fixed at five cents by an ordinance duly adopted by the board of aldermen and approved by the mayor on the 2d day of August, 1904, enacted on the application of the relator's predecessor in title and interest for the consent of the municipal authorities to the crossing of streets and highways within the city, which ordinance gave such consent on condition, among other things, that not more than five cents should be charged for the transportation of a passenger between any two points in said city. The consent or special franchise thus granted by the ordinance was formally accepted in writing by the relator's predecessor as therein required and was duly transferred to and was owned by the relator when it filed said amended passenger fare schedule. The relator is a consolidated corporation of the State of New York and is the third corporation of the same name. The original corporation was incorporated by the filing of articles of association on the 20th of March, 1872, pursuant to the General Railroad Law of 1850 (Laws of 1850, chap. 140). A defect in its incorporation was cured by an affidavit filed on January 6, 1904, pursuant to the provisions of chapter 627 of the Laws of 1903 (amdg. Laws of 1893, chap. 238), and the validity of its incorporation as thus perfected has been sustained by the Court of Appeals.

(*Matter of New York, W. & B. R. Co.*, 193 N. Y. 72.)    Its route, as defined in its charter, extended from the Harlem river to Port Chester with branches from Pelham to White Plains and to Fort Schuyler and it was to be operated by steam or other motive power.  After so obtaining the consent of the municipal authorities, it duly obtained from the Public Service Commission of both the first and second districts, on January 6, 1909, certificates of convenience and necessity pursuant to section 59 of the Railroad Law (Gen. Laws, chap. 39 [Laws of 1890, chap. 565], added by Laws of 1892, chap. 676, as amd. by Laws of 1895, chap. 545) and permission to construct its railroad and exercise its franchise pursuant to section 53 of the Public Service Commissions Law (Laws of 1907, chap. 429).

On the 20th of August, 1901, the incorporation of the New York and Port Chester Railroad was perfected by the filing of an amended certificate of incorporation pursuant to the provisions of the General Corporation Law (Gen. Laws, chap. 35 [Laws of 1892, chap. 687], § 7), and of the Railroad Law (Laws of 1890, chap. 565), and its route was defined substantially the same as that of the relator's predecessor · excepting that it had no branch line to White Plains and that it was to be operated by any motive power, other than locomotive steam power, authorized by law.  The second corporation of the same name as the relator was incorporated as a consolidated corporation pursuant to the provisions of sections 70 to 76, inclusive, of the General Railroad Law of 1890, as amended, and chapter 579 of the Laws of 1909 by the filing on the 18th day of January, 1910, of a joint agreement between the first corporation and said New York and Port Chester Railroad Company, and pursuant to the provisions of said chapter 579 of the Laws of 1909, it adopted as its route a main line from the Harlem river to Port Chester with a branch from Mount Vernon to White Plains and to Fort Schuyler from at or about One Hundred and Eightieth street.  The Public Service Commission, Second District, duly approved the consolidation and the city of New York duly consented to the transfer to the second consolidated company of the consent to crossing the streets theretofore given to the first consolidated corporation.  The Westchester Northern

Railroad was incorporated under the General Railroad Law of 1890, as amended, by filing a certificate of incorporation on the 7th of February, 1910, and its route extends from a junction with the line of the relator's immediate predecessor in White Plains to Danbury, Conn., with a branch to Brewster, N. Y.; and the certificate of incorporation provided that it might be operated by steam, electric or other mechanical power. The relator was incorporated on the 8th of June, 1915, pursuant to the provisions of article 4 of the Railroad Law (Consol. Laws, chap. 49; Laws of 1910, chap. 481), as a consolidated corporation by the filing of a joint agreement between its immediate predecessor of the same name and the Westchester Northern Railroad; and the consolidation was duly approved by the Public Service Commission of the Second District and the city of New York duly consented to the transfer to it of the consent to cross the streets which had been given to the first corporation of the same name. The relator thereby became authorized and empowered to construct and operate a line from the Harlem river in the city of New York to Port Chester with branch lines to White Plains and Fort Schuyler and to Danbury, Conn., and Brewster, N. Y.; and at the time of the filing of the amended passenger tariff schedule, in question, it was engaged in operating the main line from the Harlem river in New York city to New Rochelle and a branch line to White Plains. Its road is constructed exclusively upon its own private right of way excepting where it crosses streets or highways, and all of such crossings are either above or below the grade of the street and have been located and maintained under consents duly obtained from the appropriate local authorities. No part of its line is operated upon or along the surface of any street or highway and its only use of any public street is in so crossing the same. The length of its line from the southwesterly terminus at the Harlem river to New Rochelle is twelve and twenty-three one-hundredths miles and its branch from Mount Vernon to White Plains is about nine miles. The length of its line to Mount Vernon is ten and thirty-three one-hundredths miles and to White Plains, nineteen and fifty-six one-hundredths miles. It

**450** People ex rel. N. Y., W. & B. R. Co. *v.* P. S. Comm.

First Department, July, 1920. [Vol. 193.

has four tracks from the Harlem river to Mount Vernon and two from Mount Vernon to New Rochelle. The length of its line within the limits of the city of New York from the terminus to Dyre avenue, which is the last station within the city limits, is eight and thirty-nine one-hundredths miles. The total length of its lines within the city limits is nine and three-tenths miles. Within the city limits it crosses sixty-nine streets above grade and forty-one below grade; and the total length of these crossings within the street lines is 13,783 feet. It was intended as and is a high speed electric railroad. At the time of the hearing before the Public Service Commission it had outstanding bonds aggregating $21,390,000 and outstanding capital stock of the par value of $5,005,250 on which it has never paid dividends, and had an additional floating indebtedness of $17,080,989.10 and it was not making sufficient to pay its operating expenses and taxes. The New York Central and the New York, New Haven and Hartford Railroad, with which it competes to a certain extent, charge respectively a fare of twenty-three cents for seven and six-tenths miles and twelve cents for eight and two-tenths miles within the city.

On these facts, the Acting Deputy Public Service Commissioner, before whom the hearing was had, expressed the opinion that it is unreasonable to limit the relator within the city limits to the fare prescribed in the ordinance; but he was of opinion that the Commission was without jurisdiction to increase the rate of fare and on that theory the Commission annulled the amended schedule so filed by the relator, in so far as it provided for an increase of fare to be charged by the relator within the limits of the city and, in effect, directed the relator to amend the schedule to correspond with the provisions of the ordinance with respect to the rate of fare to be charged and to conform thereto.

*Ralph P. Buell* of counsel [*George S. Graham* and *Edward Ward McMahon* with him on the brief], for the relator.

*George H. Stover* of counsel [*Terence Farley*, attorney], for the respondent Public Service Commission.

*Joseph A. Devery* of counsel [*John P. O'Brien, Corporation Counsel*], for the respondent City of New York.

LAUGHLIN, J.:

I am of opinion that the Commission had jurisdiction by virtue of the provisions of sections 29 and 49 of the Public Service Commissions Law (as amd. by Laws of 1911, chap. 546; Laws of 1914, chap. 240, and Laws of 1917, chap. 805) to authorize the relator to charge a higher rate of fare than that prescribed by the ordinance provided the rate so prescribed was found by the Commission to be insufficient to give to the relator reasonable compensation for the service rendered and that the Commission was authorized to fix a just and reasonable rate of fare to be charged by the relator.

The relator is a railroad corporation organized under the General Railroad Law of the State, which authorized it to acquire a private right of way by purchase or condemnation and to construct and operate its railroad thereon; and to construct its road across, along or upon public highways (See section 8 of the Railroad Law, being chapter 49 of the Consolidated Laws [Laws of 1910, chap. 481, as amd. by Laws of 1918, chap. 166], which is a re-enactment of section 4 of the Railroad Law of 1890, as amended by chapter 676 of the Laws of 1892 and by section 1 of chapter 504 of the Laws of 1902, which re-enacted section 28 of chapter 140 of the Laws of 1850, as amended by chapter 724 of the Laws of 1887), subject only to its obtaining a certificate of convenience and necessity from the Public Service Commission acting for the Legislature (Section 9 of the Railroad Law, formerly section 59 of the Railroad Law of 1890, added by chapter 676 of the Laws of 1892 and amended by section 1 of chapter 545 of the Laws of 1895) and subject to its obtaining the assent of a city where its road is to be constructed in, upon or across any street of the city (Section 21 of the Railroad Law, formerly section 11 of the Railroad Law of 1890 and theretofore subdivision 5 of section 28 of chapter 140 of the Laws of 1850, as amended by chapter 724 of the Laws of 1887) and subject also to its obtaining the permission and approval of the proper Public Service Commission to the construction of its railroad, or any extension thereof, and the exercise of its franchise (Section 53 of the Public Service Commissions Law, formerly section 53 of the Public Service Commissions Law of 1907). With respect to such a railroad the Legislature itself

prescribed the rate of fare to be charged depending upon the length of the line. (Section 57 of the Railroad Law, formerly section 37 of the Railroad Law of 1890, as amended by chapter 676 of the Laws of 1892. See, also, section 28, subdivision 9, of chapter 140 of the Laws of 1850, as amended by chapter 724 of the Laws of 1887.) The public roads and highways throughout the State, no matter by whom acquired under authority derived from the Legislature, are held for the use and benefit of the public and there being no constitutional limitation on the power of the Legislature to authorize the incorporation, construction and operation of railroads, other than street railroads (State Const. art. 3, § 18), except that they must be authorized by *general* laws, it was competent for the Legislature, if it saw fit so to do, to authorize a railroad, other than a street railroad, to be constructed upon, along or across any public highway or street in the State without obtaining the consent of the local authorities therefor. (*Delaware, L. & W. R. R. Co.* v. *City of Buffalo,* 65 Hun, 464; *People* v. *Delaware & Hudson Co.,* 213 N. Y. 202; *People ex rel. Simon* v. *Bradley,* 207 id. 592; *Beekman* v. *Third Ave. R. R. Co.,* 153 id. 144, 152; *People* v. *Kerr,* 27 id. 188; *Worster* v. *Forty-second Street, etc., R. R. Co.,* 50 id. 205; Dillon Mun. Corp. § 1222. See, also, *Ghee* v. *Northern Union Gas Co.,* 158 N. Y. 510; *Potter* v. *Collis,* 19 App. Div. 392.) Having fixed a rate of fare to be charged by such railroads and having authorized such use of the public streets by them, subject only to the consent of the local authorities, it is a reasonable inference that the Legislature in giving cities authority to pass upon applications for such consents did not intend to authorize them, as a condition of granting their consent, to revise or change the fares prescribed by the Legislature with respect to railroads organized under the General Railroad Law, as is the relator. It is quite clear, I think, that the Legislature merely intended to authorize the local authorities, in consenting to the construction of such railroads across streets by crossings above or below the grade of the street, to regulate the crossing with respect to the convenience and safety of those lawfully using the streets, which would involve the nature and elevation of the construction overhead or under-

neath the surface of the street (*Delaware, L. & W. R. R. Co.* v. *City of Buffalo,* 65 Hun, 464; S. C., 4 App. Div. 562; affd., 158 N. Y. 266), and where such railroads are permitted to cross the street at grade the safety of the public requires the regulation of the speed (*City of Buffalo* v. *N. Y., L. E. & W. R. R. Co.,* 152 N. Y. 276) and involves the form and manner of the construction of the crossing with respect to the safety and convenience of persons, vehicles and animals, and may justify requiring the use of gates and flagmen, and the giving of particular warnings and signals. It would not seem, however, on any theory, that the Legislature by requiring such consent intended to authorize the local authorities to impose conditions with respect to the rates of fares to be charged for the transportation of passengers which the Legislature itself had prescribed and regulated. (*People ex rel. South Shore T. Co.* v. *Willcox,* 196 N. Y. 212; *People ex rel. Village of S. Glens Falls* v. *P. S. Comm.,* 225 id. 216; *People ex rel. Bridge Operating Co.* v. *Pub. Serv. Comm.,* 153 App. Div. 129.) The relator might have contested that point by mandamus proceeding to compel the board of aldermen to eliminate from its consent the attempt to regulate fares. (*People ex rel. Parkway Co.* v. *Kennedy,* 97 App. Div. 103; *People ex rel. South Shore T. Co.* v. *Willcox, supra.* See, also, *People ex rel. Frontier Electric R. Co.* v. *North Tonawanda,* 70 Misc. Rep. 91; affd., 143 App. Div. 955.) But this the relator did not do. On the contrary it formally accepted all the terms and conditions of the ordinance, and down to the present time has acquiesced therein, and doubtless it should not now be heard, in its own right, to question the validity of the provisions of the ordinance as binding it until it is relieved therefrom. (*Rochester Telephone Co.* v. *Ross,* 125 App. Div. 76; affd., 195 N. Y. 429; *Pond* v. *New Rochelle Water Co.,* 183 id. 330; *City of Buffalo* v. *Frontier Telephone Co.,* 203 id. 589.) It does not follow, however, that the Legislature could not itself change the rate of fare so prescribed by the ordinance or could not authorize the Public Service Commission, acting for it, so to do. (*People ex rel. Village of S. Glens Falls* v. *P. S. Comm., supra,* 223, 226, 227.) If, as we must assume, it is of importance to the public that this service be maintained, the point presented is not whether the relator can be heard to question the provisions of the

454 People ex rel. N. Y., W. & B. R. Co. *v.* P. S. Comm.

First Department, July, 1920. [Vol. 193

grant but whether they are beyond the control of the Legislature with respect to the rate of fare. With respect to such conditions imposed by the municipal authorities in the exercise of their right conferred by section 18 of article 3 of the State Constitution to grant or withhold the consent to the construction and operation of a street railroad for the construction of which the consent of the owners of one-half in value of the property bounded on the street or highway is also required, the power and authority of the Legislature *effectively* to increase the rate of fare without the consent of the municipal authorities so that there may be no forfeiture of the grant by the latter, has down to the present been left in doubt. (*Matter of Quinby* v. *Pub. Serv. Comm.*, 223 N. Y. 244; *People ex rel. Village of S. Glens Falls* v. *P. S. Comm.*, 225 id. 216; *Matter of International R. Co.* v. *Pub. Serv. Comm.*, 226 id. 474; *People ex rel. City of New York* v. *Nixon*, 190 App. Div. 612. See, also, *People ex rel. New York & N. S. T. Co.* v. *Pub. Serv. Comm.*, 175 App. Div. 869.) The relator, however, is in no sense a street railroad corporation. (See *Matter of Koehn* v. *Pub. Serv. Comm.*, 107 Misc. Rep. 151.) It was not organized nor was either of its predecessors organized under the Street Railroad Law of the State (Laws of 1884, chap. 252, as amd.; Railroad Law of 1890, art. 4, as amd.; Railroad Law of 1910, art. 5, as amd.), but under the General Railroad Law, the same as the New York Central and other general railroad corporations. It uses no part of the surface of any street or highway. It does not take on or discharge passengers on streets or at street crossings but only at its own stations on its private right of way. The city authorities, therefore, in enacting the ordinance giving their consent to the relator to cross the streets, were not exercising any power or authority derived from the Constitution or with respect to matters concerning which the municipality had any absolute right, but were exercising part of the police power of the State, delegated by the Legislature, over which the Legislature had full control and, therefore, although the grant when thus accepted became in a sense a contract, the police power of the State in the premises and particularly with respect to regulating fares, did not irrevocably pass and the contract thus evidenced did not become a contract within the protection of subdivision 1 of section 10 of article 1 of the Federal

Constitution, but remained subject to the police power of the State under which the exercise of the grant might be regulated from time to time as required in the interest of the public. (*People ex rel. Village of S. Glens Falls* v. *P. S. Comm., supra; Matter of Quinby* v. *Pub. Serv. Comm., supra; People ex rel. New York & N. S. T. Co.* v. *Pub. Serv. Comm.,* 175 App. Div. 869; *People ex rel. Bridge Operating Co.* v. *Pub. Serv. Comm.,* 153 id. 129; *People ex rel. South Shore T. Co.* v. *Willcox,* 196 N. Y. 212; *Milwaukee Electric Railway* v. *Wisconsin R. R. Comm.,* 238 U. S. 174; *Louisville & Nashville R. R.* v. *Mottley,* 219 id. 467; *Matter of Koehn* v. *Pub. Serv. Comm.,* 107 Misc. Rep. 151.) The provisions of the charter of the city under which it is claimed the city acted in granting its consent, which was so required by the General Railroad Law, were sections 72–74 of the Greater New York charter, as amended and revised by chapter 466 of the Laws of 1901. Said section 72 provides that every grant of or relating to a franchise of any character must, unless otherwise provided in the act, be by ordinance. Section 73, in so far as here material, provided that after the approval of the act, no franchise or right to use the streets or highways should be granted by the board of aldermen to any person or corporation for a longer period than twenty-five years, except as thereinafter provided, but that such grant might at the option of the city provide for giving to such grantee the right on a fair revaluation or revaluations to renewals not exceeding in the aggregate twenty-five years. It then provided that at the termination of the franchise, all rights or property of the grantee in the streets should cease without compensation and that it might be provided in the grant that upon the termination of the franchise, the plant of the grantee and appurtenances should be and become the property of the city without compensation or on payment of the fair valuation thereof. The section further provided as follows: " Every grant shall make adequate provision by way of forfeiture of the grant, or otherwise, to secure efficiency of public service at reasonable rates and the maintenance of the property in good condition throughout the full term of the grant." Section 74 provided that the proposed specific grant should be embodied in an ordinance with all of the terms and conditions including the provisions

456 People ex rel. N. Y., W. & B. R. Co. *v.* P. S. Comm.

First Department, July, 1920. [Vol. 193.

as to rates, fares and charges and provided for the publication thereof and for a reference to the board of estimate and apportionment to inquire with respect to the money value of the franchise and the adequacy of the compensation proposed to be paid therefor. (See, also, Greater New York Charter, §§ 72–74, as amd. by Laws of 1905, chaps. 629, 630. See, also, Laws of 1914, chap. 467, adding to Greater New York Charter, § 74.) The grant in question was for a period of twenty-five years with a provision for an extension for a like period and the grantee was limited to charging not more than five-cent fares during the first period and it was provided that it might be so limited during the extended period. The learned counsel for the relator forcibly contends that if these statutory provisions were applicable the duty was imposed by the Legislature upon the board of aldermen so to frame the provisions of the grant as to secure efficiency of the public service at reasonable rates and the maintenance of the property in good condition throughout the term and any renewal thereof and that if it has failed so to do, its action was not a proper exercise of the power delegated by the Legislature and was not binding on the Legislature. On the facts presented, it is evident that the contemplated public service cannot be rendered at the rate of fare prescribed in the ordinance. If, therefore, there were any doubt on the point as to whether the Legislature has delegated all of its power in the premises irrevocably, it is quite clear that in the circumstances of this case it cannot be so held, for if these provisions of the Greater New York charter were applicable to a consent to the *crossing of streets* by such a railroad company the authority conferred has not been exercised as authorized and, therefore, it remained competent for the Legislature to take such action as might be necessary with respect to the rate of fare to be charged to secure the efficiency of the public service contemplated by the grant at reasonable rates. The case, as I view it, falls directly within the decision of the Court of Appeals in *People ex rel. Village of S. Glens Falls* v. *P. S. Comm.* (*supra*) wherein it was held that, notwithstanding the fact that the Legislature had made it a condition of the right of the gas company to use the public streets that the consent of the local authorities be obtained therefor and the local

authorities in granting such consent prescribe the rate to be charged to consumers, it was still within the power of the Legislature to increase such rates and that it had delegated authority in that respect to the Public Service Commission. Assuming that I am right in reaching the conclusion that the Legislature has jurisdiction in the premises to increase the rate of fare, it is quite clear, I think, that it has delegated its authority in the premises to the Public Service Commission by virtue of the provisions of said sections 29 and 49 of the Public Service Commissions Law. (*People ex rel. Ulster & Delaware R. R. Co.* v. *Pub. Serv. Comm.*, 171 App. Div. 607; affd., 218 N. Y. 643; *Matter of International R. Co.* v. *Pub. Serv. Comm., supra.*)

It follows, therefore, that the determination of the Public Service Commission should be annulled, with fifty dollars costs and disbursements, and that the matter should be referred back to the Commission to determine the reasonableness of the fare of seven cents proposed to be charged by the relator by the schedule of passenger rates so filed by it.

CLARKE, P. J., DOWLING, PAGE and MERRELL, JJ., concur.

Writ sustained and determination annulled, with fifty dollars costs and disbursements, and the matter referred back to the Commission to determine the reasonableness of the fare proposed to be charged by the relator by the schedule filed by it. Settle order on notice.